IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0577-05






EX PARTE SWANDA MARIE LEWIS, Appellant






ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


TARRANT COUNTY





 Price, J., filed a dissenting opinion in which Meyers and Holcomb, JJ., joined.



DISSENTING OPINION 



 I agree that Article I, Section 14 of the Texas Constitution has been, and should
continue to be, read to apply in the mistrial setting. I therefore agree with Parts I through III
of the Court's opinion. I disagree, however, that any of the justifications for ignoring stare
decisis apply to support overruling Bauder v. State. (1) I therefore dissent to Part IV, and to the
majority's disposition of this case. I would reject the State's contentions that Bauder ought
to be overruled, and proceed to its third ground for review, which the majority instead
dismisses, to determine whether the court of appeals properly applied Bauder to the facts of
the instant case. Because the majority does not, I ultimately dissent.

I. FEDERALISM


 It has by now been established beyond serious debate that in construing provisions of
our own constitution "we must ultimately follow our own lights." (2) We may construe our own
constitutional provisions either more protectively than their federal constitutional
counterparts, as we did in Bauder, or less protectively, as we did in Hulit v. State. (3) In Bauder
we construed Article I, Section 14 of the Texas Constitution (4) to be more solicitous of a
defendant's "valued right to have his trial completed by a particular tribunal" (5) than the
Supreme Court interpreted the Fifth Amendment to afford in Oregon v. Kennedy. (6) Now,
little more than ten years after Bauder, the majority declares our construction of Article I,
Section 14 to represent an elusive "ideal," and declares that the "real ideal" is the Supreme
Court's standard in Kennedy. (7) I do not believe the majority's belated arguments in favor of
the federal "ideal" are sufficiently compelling to justify disregarding stare decisis. (8)

 As the majority develops in Part III of its opinion, this Court's predecessor, the Texas
Court of Appeals, long ago held that the concept of jeopardy, as embodied in what is now
Article I, Section 14 of the Texas Constitution, is broad enough to protect a defendant's right
to proceed to a final verdict, once the jury has been impaneled and sworn. (9) It did so long
before the United States Supreme Court first expressly recognized, in 1949, that a criminal
defendant has a "valued right" under the Fifth Amendment "to have his trial completed by
a particular tribunal." (10) But once the Fifth Amendment's double jeopardy protection was
found to be applicable to the states by incorporation through the Fourteenth Amendment, in
1969, (11) this Court, like many state courts across the country, allowed the Supreme Court to
take the lead in developing double jeopardy doctrine. Thus, in the 1970s and 1980s, until
Bauder came along, we were content to follow the dictates of federal precedent, including
Oregon v. Kennedy, as a matter of federal jeopardy law, without addressing the independent
question of whether we ought to construe our analogous state constitutional provision any
differently. (12) Federal jeopardy law had become the template for decision. Bauder required
us to decide whether, in applying our own jeopardy provision in a case of first impression,
we would conform to the federal template or "follow our own lights."

 The majority acknowledges that an historical analysis of our own jeopardy provision
would not shed any light on the question, either now or at the time Bauder was decided. (13) 
The question whether double jeopardy protection is implicated by prosecutorial misconduct
that provokes a defendant to request a mistrial arose during the interim when state courts
were deferring to the federal template. Cases like United States v. Jorn, (14) United States v.
Dinitz, (15) and Arizona v. Washington, (16) which formed the doctrinal backdrop for Oregon v.
Kennedy, were all decided during this interim. It was a new gloss on double jeopardy law. 
The question in Kennedy was how far to go with that new gloss under the Fifth Amendment,
consistent with the principles of double jeopardy. And squarely presented to this Court for
the first time in Bauder was whether to adopt that gloss at all under Article I, Section 14, and,
if so, how far to take it consistently with our own understanding of the proper scope of
double jeopardy protections. That is all the majority has done today. It simply disagrees with
the majority that decided Bauder.

II. PROSECUTORIAL MISCONDUCT


 The criminal defendant's right to have his trial completed by the tribunal originally
selected to decide his fate, once jeopardy has attached, has never been regarded as absolute. 
Indeed, when first recognized by the Supreme Court in Wade v. Hunter, that right was
immediately balanced against "the public's interest in fair trials designed to end in just
judgments." (17) This is the reason that "manifest necessity" will justify a mistrial, even in the
event of ordinary judicial or prosecutorial error. As Justice Stevens explained for the
Supreme Court in Arizona v. Washington:

 Because of the variety of circumstances that may make it necessary to
discharge a jury before a trial is concluded, and because those circumstances
do not invariably create unfairness to the accused, his valued right to have the
trial concluded by a particular tribunal is sometimes subordinate to the public
interest in affording the prosecutor one full and fair opportunity to present his
evidence to an impartial jury. Yet in view of the importance of that right, and
the fact that it is frustrated by any mistrial, the prosecutor must shoulder the
burden of justifying the mistrial if he is to avoid the double jeopardy bar. His
burden is a heavy one. The prosecutor must demonstrate "manifest necessity"
for any mistrial declared over the objection of the defendant. (18)


Courts need not inquire about manifest necessity for a mistrial, however, when the defendant
himself asks for or consents to it. The defendant's consent signals his election to forego his
right to proceed to verdict with the first tribunal even though prejudicial error may have been
injected into the proceedings, and there is no jeopardy bar to reprosecution. (19)

 The defendant may reasonably conclude that a continuation of the tainted
proceeding would result in a conviction followed by a lengthy appeal and, if
a reversal is secured, by a second prosecution. In such circumstances, a
defendant's mistrial request has objectives not unlike the interests served by
the Double Jeopardy Clause-the avoidance of the anxiety, expense, and delay
occasioned by multiple prosecutions. (20)


The choice must be the defendant's, to-wit: whether he believes his interest in avoiding
anxiety, expense, and delay is better served by proceeding to verdict with the first tribunal,
and possible acquittal, or by cutting the first prosecution short in order to proceed more
expeditiously with a second. And in this context, "[t]he important consideration, for
purposes of the Double Jeopardy Clause, is that the defendant retain primary control over"
that decision. (21)

 At some point, of course, ordinary prosecutorial error may rise to the level of
prosecutorial misconduct. And, at some point, prosecutorial misconduct may become so
egregious that it cannot fairly be said that the defendant has retained primary control over the
decision whether to proceed to verdict or abort the proceedings. The question for decision
in Oregon v. Kennedy was how to identify prosecutorial misconduct that is so manipulative
that it deprives the defendant of a "meaningful"choice of which option best protects his
interest in avoiding as much as possible the anxiety, expense, and delay inherent in criminal
prosecution. (22) In making this determination, a court must be mindful of the competing values
that are at stake-on the one hand, the defendant's valued right to proceed to verdict with the
first tribunal, and on the other, the State's equally valued right to "one full and fair
opportunity to present [its] evidence to an impartial jury." (23) At what point does prosecutorial
misconduct cause the scale to tip in favor of the defendant's right, notwithstanding that it was
he who requested the mistrial?

 In Oregon v. Kennedy, the Supreme Court answered this query for Fifth Amendment
purposes by holding that a criminal defendant loses primary control over the critical choice
whether to proceed to verdict or abort only "where the governmental conduct in question is
intended to 'goad' the defendant into moving for a mistrial[,]" and that only then "may a
defendant raise the bar of double jeopardy to a second trial after having succeeded in
aborting the first on his own motion." (24) But why should this be so? It is not self-evident that
the specific intent to provoke a mistrial request should be the only degree of prosecutorial
culpability sufficient to reinvigorate the defendant's valued right to proceed to verdict with
the first tribunal despite the fact that he asked for the mistrial. The State is entitled to one
full and fair opportunity to present its evidence to an impartial jury. It can reasonably be
argued that other, lesser degrees of prosecutorial culpability should suffice to justify the
conclusion that the State has abused, and therefore forfeited, that opportunity. When the
prosecutor intentionally commits misconduct he knows will seriously compromise the
fairness of the trial, he has arguably squandered his one full and fair opportunity to present
his case, so that the State's interest can no longer be said to outweigh the defendant's-even
if he did not harbor a specific intent to provoke a mistrial. If his intention was to inject
manifest unfairness into the proceeding, and he was consciously indifferent with respect to
whether this intentional misconduct illegitimately increased his chances of gaining a
conviction or provoked the defendant into asking for a mistrial, the argument is practically
as compelling that he has forfeited his one full and fair opportunity to present his case as
when it was his specific intent to provoke a mistrial. Either way, a reasonable argument can
be made that the prosecutor has manipulated the defendant's choice to such an extent that it
is no longer primarily the defendant's, and the State can no longer show that its interest
outweighs the defendant's in the constitutional balance.

 This is, in essence, what we held in Bauder. (25) It was not an unreasonable or an
outlandish holding. It was certainly not a unique holding. (26) It may even have been the more
logical holding, given the constitutional principles involved. (27) In any event, it was not such
a manifestly erroneous holding that we can justify overruling it just because there is a
majority of the Court presently willing to do so. I next address what I understand to be the
majority's asserted reasons for doing so.


 III. DISREGARDING STARE DECISIS


 As I break down the majority's opinion, it has identified essentially six flaws in the
Bauder analysis that, taken together, are serious enough to justify its demise. I do not share
any of those concerns. I will respond to them in turn. 

A. Only a Specific Intent to Provoke Mistrial Triggers Jeopardy Concerns


 Like the Supreme Court in Oregon v. Kennedy, the majority believes that a specific
prosecutorial intent to provoke a mistrial "is critical to determining whether [the prosecutor],
rather than the defendant, has exercised primary control over whether a mistrial is sought." (28) 
For reasons I have already explained, a specific intent to provoke mistrial is not the only
degree of prosecutorial culpability that can reasonably be found to trigger jeopardy
protection. The majority does not explain why a slightly lesser degree of prosecutorial
culpability could not also justify a court in concluding that the prosecutor has forfeited his
one full and fair opportunity to present his case, thus tipping the balance in the defendant's
favor on the double jeopardy scale. In Bauder we essentially held that a prosecutor who
consciously disregards a known risk that his deliberate misconduct will provoke a mistrial,
even if a mistrial was not necessarily his conscious objective, nevertheless harbors a degree
of culpability sufficient to forfeit his one full and fair opportunity. (29) The majority does not
convince me that this cannot reasonably be regarded as a sufficient level of culpability to
justify jeopardy protection.

 The majority argues that our earliest case law deemed the premature termination of
a trial to implicate jeopardy concerns only because it was the functional equivalent of an
acquittal, (30) and a prosecutor whose conscious objective is not necessarily to provoke a
mistrial cannot be said to have sought the functional equivalent of an acquittal. (31) But this is
not self-evident to me either. A prosecutor who has consciously disregarded a substantial
risk that his deliberate misconduct would provoke a mistrial has also consciously disregarded
the substantial risk his conduct would cause the functional equivalent of an acquittal, even
if that was not necessarily his conscious objective. To reiterate: It is not unreasonable for a
court to conclude, as we did in Bauder, that such a prosecutor has abused, and therefore
forfeited, his one full and fair opportunity at a verdict favorable to the State.

B. Bauder Is Due Process in Double Jeopardy Clothing


 The majority claims that, by focusing on the fact that a slightly lesser degree of
prosecutorial culpability than specific intent may also compromise the defendant's right to
a fair trial before the first tribunal selected, the Court in Bauder "conflates the double
jeopardy protection with more generalized notions of due process and due course of law." (32) 
Elsewhere it has been suggested that to apply a lesser standard of culpability than specific
intent to justify jeopardy relief is merely a means for courts to punish prosecutors, rather than
to scrupulously serve double jeopardy principles. (33) I disagree on both counts.

 Both the defendant and the State are entitled to one full and fair opportunity for trial. 
Ordinarily, double jeopardy entitles the defendant to proceed to verdict with the first tribunal
selected. Manifest necessity or the defendant's own consent may suffice to defeat his
constitutional interest, but not otherwise. This means that sometimes the defendant must
experience the anxiety, expense, and delay of a second trial even when his first trial was
rendered unfair for reasons unattributable to him. But he should not necessarily have to
suffer that consequence when the retrial was attributable to deliberate misconduct on the part
of the prosecutor. When that misconduct so compromised the fairness of trial as to render
mistrial inevitable, and the prosecutor was at least consciously indifferent to that result, the
State may reasonably be said to have abused its one full and fair opportunity to present its
evidence to an impartial tribunal, and it can no longer carry its burden to demonstrate that its
interest in the jeopardy balance outweighs the defendant's, even when it was the defendant
who requested a mistrial. Thus, jeopardy principles are vindicated. It is true that the fairness
that due process and due course of law guarantee may also be vindicated and that the
prosecutor may feel he is being made to pay a heavy price for his misconduct. But these
consequences are incidental to, and do not by any means displace, the jeopardy analysis.

C. Later Case Law Is Inconsistent with Bauder


 The majority complains that if we were correct in Bauder to find a lesser prosecutorial
culpability to be sufficient to trigger jeopardy protection in the context in which the trial
court grants a defendant's motion for mistrial, we should also have held, as other
jurisdictions have done, that even when the trial court erroneously denies the mistrial, we
should bar retrial after the defendant successfully challenges his conviction on appeal. (34) In
Ex parte Davis (35) and Ex parte Mitchell, (36) we expressly declined to do so. We held that the
defendant had not been deprived of his valued right to proceed to verdict with the first
tribunal, since his trial was prosecuted to a conclusion, albeit a conviction. This may well
represent a logical inconsistency in our case law. (37) But if so, it applies with equal illogic
whether the prosecutor consciously intended to cause a mistrial or he consciously disregarded
a substantial risk his misconduct would provoke a mistrial. (38) Thus, to the extent these cases
are logically unfaithful to Bauder, they are equally unfaithful to the Oregon v. Kennedy
standard. It seems to me that if any of our precedent deserves closer scrutiny, it would be
Davis and Mitchell, not Bauder. 

D. The Bauder Standard Is Too Amorphous


 I do not disagree with the majority that mistrials that result in a jeopardy bar ought to
be relatively rare occurrences. (39) The Bauder standard, particularly as it was later elaborated
in Ex parte Peterson, (40) should produce jeopardy bars only in a very slightly greater number
of cases than the Oregon v. Kennedy standard. The majority complains that some of the
language in Bauder seemed to blur the concept of recklessness, creating a danger that it
might be understood as something akin to the prosecutorial "overreaching" standard that the
Supreme Court flatly rejected in Oregon v. Kennedy. (41) Again, whatever imprecision may
have inhered in the specific language of Bauder itself, and whatever confusion it may have
engendered, was later remedied in our opinion in Peterson. I do not think any reasonable
prosecutor would now mistake the standard explicitly set out in Peterson as a rule imposing
a jeopardy bar on the basis of mere prosecutorial "overreaching." It makes little sense to
discard a legal standard barely three years after, in the ordinary evolution of our decisional
law, we have finally perfected it.

 I cannot agree with the majority that, even as perfected, the standard articulated in
Peterson will not adequately equip prosecutors to be able to tell that deliberate misconduct
sufficient to trigger double jeopardy protection from that deliberate misconduct which is
not. (42) A prosecutor knows he should never engage in deliberate misconduct-that is to say,
it should never be his design and conscious objective to commit what he recognizes to be
misconduct. Under Bauder/Peterson, if he does so with the conscious objective to provoke
a mistrial, or with a conscious disregard for the substantial risk it would cause a mistrial,
double jeopardy protections will apply. Either state of mind can be established (or refuted)
by an express assertion from the prosecutor, or by evidence of the circumstances surrounding
his misconduct such as those that we enumerated in Peterson. (43) The degree of risk that the
prosecutor's deliberate misconduct will result in a mistrial is largely a function of the amount
of unfair prejudice it injects into the proceedings. The more unfair prejudice his deliberate
misconduct injects, the more compelling will be the inference that he was aware of the risk
(because it was, objectively speaking, more obvious), and consciously disregarded it. (44) This
standard is not so amorphous that it cannot fairly be imposed upon responsible prosecutors.

E. Trial Court Will Stop Granting Mistrials


 The majority fears that the overly "broad" standard in Bauder will cause trial courts
to unduly hesitate to grant meritorious mistrials on account of the jeopardy consequences. (45) 
I do not believe the Bauder standard, especially as solidified in Peterson, is so much broader
than that of Oregon v. Kennedy that it will substantially increase whatever public or media
pressure trial courts feel to eschew meritorious mistrials. In any event, I do not share the
majority's (and the Kennedy Court's) cynical distrust of trial judges to follow their oaths to
uphold the law. (46) A conscientious trial court should always exercise its discretion to grant
any motion for mistrial that it fairly judges to be meritorious, regardless of the potential for
later double jeopardy consequences. The presumption that we should institutionalize in our
case law is that a trial court will do so, not that it will not. (47)

 The majority observes that this tendency it perceives in trial courts to want to avoid
mistrials could have been "ameliorate[d]." (48) We could have held, in Davis and Mitchell, that
double jeopardy protections also apply when a conviction is reversed on appeal due to the
failure of the trial court to grant a meritorious mistrial following misconduct that the
prosecutor committed with conscious disregard of the substantial risk that it would cause a
mistrial. Such a holding would have created at least some disincentive for trial courts to
avoid granting meritorious mistrials. (49) If I shared the majority's premise that we cannot trust
trial courts to follow the law, this observation would cause me to question the correctness of
our decisions in Davis and Mitchell, not the correctness of our decisions in Bauder and
Peterson.

F. Bauder Has Proven Unworkable


 The majority documents at some length the "messy jurisprudence flowing from
Bauder." (50) It is true that, since Bauder, the Court has not always been entirely consistent in
its articulation of the standard. (51) But a certain amount of fine-tuning is inevitable in the
evolution of decisional law. (52) I do not understand the majority to hold that our most recent
clarification was a failure-in fact, quite the opposite, since it is at least acknowledged that
what Bauder meant by "recklessness" was firmly nailed down in Ex parte Peterson. (53) I
cannot agree that a case barely three years old (Peterson) ought to be overruled on the ground
that it has proven unworkable. We had no problems applying it in our recent decision in Ex
parte Wheeler. (54) In that case we overruled the court of appeals and reinstated the trial court's
ruling, which had denied double jeopardy relief. The only real point of contention between
this Court and the court of appeals was whether the court of appeals had erred in failing to
give proper deference to the trial court's application of the Bauder/Peterson standard. (55) 
There was no confusion evident at any level of the proceedings as to the substance of that
standard. At this point, only time can tell whether further "refinement" will be necessary. (56) 
I cannot fathom the majority's haste and determination to dispatch a standard so soon after
we have managed, at least with apparent success, to work the kinks out of it.

IV. APPLICATION OF BAUDER/PETERSON


 We originally remanded this cause to the court of appeals for its reconsideration in
light of Peterson, which had come down after the court of appeals' original opinion. (57) Thus,
the court of appeals was the first to conduct an analysis under the refined Peterson standard. 
The court of appeals meticulously applied the Peterson factors to conclude that our state
constitutional jeopardy protection applied to bar retrial. In its petition and its brief on the
merits, the State disagrees with the court of appeals' conclusion, but does not identify any
substantial flaw in its application of the law as expounded in Peterson. I do not find any, and
would therefore affirm its judgment.

CONCLUSION


 The majority's bottom-line seems to be that the Bauder/Peterson standard is too
broad, and not adequately tethered to legitimate double jeopardy principles. (58) But, as I have
endeavored to develop in Part II of this opinion, the doctrinal basis for that standard is more
than evident enough, and it embodies an eminently reasonable construction of Article I,
Section 14, our state constitutional jeopardy provision. I therefore dissent to Part IV of the
Court's opinion and to its disposition of the case. I would proceed to the State's third ground
for review and hold that the court of appeals did not err in its application of the
Bauder/Peterson standard. Because the Court's disposition instead moots that inquiry, I
respectfully dissent.

Filed: January 10, 2007

Publish
1. 921 S.W.2d 696 (Tex. Crim. App. 1996).
2. Olson v. State, 484 S.W.2d 756, 762 (Tex. Crim. App. 1969). See also Heitman v. State,
815 S.W.2d 681 (Tex. Crim. App. 1991); Bauder v. State, supra, at 700-01 (Clinton, J., concurring).
3. 982 S.W.2d 431 (Tex. Crim. App. 1998).
4. Tex. Const. art. I, § 14 ("No person, for the same offense, shall be twice put in jeopardy
of life or liberty, nor shall a person be again put upon trial for the same offense, after a verdict of not
guilty in a court of competent jurisdiction.").
5. Wade v. Hunter, 336 U.S. 684, 689 (1949).
6. 456 U.S. 667 (1982).
7. Slip op. at 63.
8. That precedent is less than "ideal" is no basis for overruling it, even when construing
constitutional law, in which context stare decisis carries the least weight. Dickerson v. United
States, 530 U.S. 428, 443 (2000).
9. Powell v. State, 17 Tex. Ct. App. 345 (1884).
10. Wade v. Hunter, supra. See also Crist v. Bretz, 437 U.S. 28, 31 (1978) ("The reason for
holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the
interest of an accused in retaining a chosen jury."); id., at 45-47 (Powell, J., dissenting)
("defendant's valued right to have his trial completed by a particular tribunal" was first developed
as constitutional doctrine by state courts during 19th century, and only later acknowledged by the
Supreme Court in Wade).
11. Benton v. Maryland, 395 U.S. 784 (1969).
12. E.g., Chvojka v. State, 582 S.W.2d 828 (Tex. Crim. App. 1979); Anderson v. State, 635
S.W.2d 722 (Tex. Crim. App. 1982); Collins v. State, 640 S.W.2d 288 (Tex. Crim. App. 1982); 
Crawford v. State, 703 S.W.2d 655 (Tex. Crim. App. 1986).
13. Slip op. at 33.
14. 400 U.S. 470, 485 n. 12 (1971) ("[W]here a defendant's mistrial motion is necessitated by
judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution may well be
barred.").
15. 424 U.S. 600, 609 (1976) ("The important consideration, for purposes of the Double
Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the
event of [judicial or prosecutorial] error.").
16. 434 U.S. 497, 508 (1978) ("[T]he strictest [constitutional] scrutiny is appropriate . . . when
there is reason to believe that the prosecutor is using the superior resources of the State to harass or
to achieve a tactical advantage over the accused."). 
17. 336 U.S. at 689.
18. Id. at 505.
19. United States v. Dinitz, supra.
20. Id. at 608.
21. Id. at 609.
22. See Oregon v. Kennedy, supra, at 689 (Stevens, J., concurring in the judgment) (it is
sufficient to invoke double jeopardy protections that "the court is persuaded that egregious
prosecutorial misconduct has rendered unmeaningful the defendant's choice to continue or to abort
the proceedings"). 
23. Arizona v. Washington, supra, at 505.
24. 456 U.S. at 676.
25. 921 S.W.2d at 699.
26. Other state courts, both before and after our holding in Bauder, have construed their own
state constitutional jeopardy provisions more protectively than Oregon v. Kennedy construed the
Fifth Amendment protection, each essentially finding that an intent to goad the defendant into a
mistrial is not the only degree of prosecutorial culpability sufficient to trigger double jeopardy
protection. E.g., State v. Kennedy, 295 Ore. 260, 666 P.2d 1316 (1983); Pool v. Superior Court, 139
Ariz. 98, 677 P.2d 261 (1984); Commonwealth v. Smith, 532 Pa. 177, 615 A.2d 321 (1992); State
v. Breit, 122 N.M. 655, 930 P.2d 792 (1996); State v. Rogan, 91 Haw. 405, 984 P.2d 1231 (1999); 
People v. Batts, 30 Cal. 4th 660, 68 P.3d 357, 134 Cal. Rptr. 2d 67 (2003).
27. See Oregon v. Kennedy, supra, at 686, 689-690 (Stevens, J., concurring in the judgment).
28. Slip op. at 41.
29. In Ex parte Peterson, 117 S.W.3d 804, 817 (Tex. Crim. App. 2003), we elevated the level
of prosecutorial culpability to "conscious disregard for a substantial risk that" the prosecutor's
deliberate misconduct would provoke a mistrial. (Emphasis added.) I have no quarrel whatsoever
with this adjustment to the standard, and I joined the per curiam majority in Peterson.
30. See Powell v. State, supra, at 351.
31. Slip op. at 42.
32. Slip op. at 40.
33. See Peter J. Henning, Prosecutorial Misconduct and Constitutional Remedies, 77 Wash. U.
L. Q. 713, 811-817 (1999) (state cases extending state constitutional jeopardy protections to cover
lesser degrees of prosecutorial culpability than Oregon v. Kennedy found to have jeopardy
implications for Fifth Amendment purposes "really are responding to the broader problem of finding
an effective means to punish prosecutorial misconduct").
34. Slip op. at 42-43, 50-52, 63-64. 
35. 957 S.W.2d 9 (Tex. Crim. App. 1997).
36. 977 S.W.2d 575 (Tex. Crim. App. 1997).
37. See Rick A. Bierschbach, Note, One Bite at the Apple: Reversals of Convictions Tainted by
Prosecutorial Misconduct and the Ban on Double Jeopardy, 94 Mich. L. Rev. 1346 (1996).
38. See Ex parte Davis, supra, at 13 ("Applicant has not directed us to any cases . . . where the
Supreme Court has explicitly extended Oregon v. Kennedy to apply to instances where verdicts of
guilty have been reversed on appeal due to prosecutorial misconduct, and therefore holding retrials
as jeopardy barred."); Ex parte Mitchell, supra, at 579 & 580 ("Appellant does not direct us to any
cases where the Supreme Court has explicitly extended Oregon v. Kennedy to apply to instances
where verdicts of guilty have been reversed on appeal, due in whole or in part to prosecutorial
misconduct, and thereby holding retrials as jeopardy barred.") ("Only where the prosecutor's
intentional, and deliberate misconduct goads the accused into moving for a mistrial-and that motion
is granted-is the accused's right to be tried to verdict by the first tribunal, a right afforded to him by
the double jeopardy clause of the Fifth Amendment, violated.").
39. Slip op. at 46-48.
40. 117 S.W.3d at 816-817.
41. Slip op. at 48-50.
42. Slip op. at 50.
43. 117 S.W.3d at 818-19.
44. This is not to say that the fact finder could not, under some circumstances, reasonably
conclude that the prosecutor was simply unaware of the substantial risk, even though an ordinary 
prosecutor ought to have been aware of it, and his failure to perceive it constitutes a gross deviation
from the standard of care that an ordinary prosecutor would exercise under the circumstances. See
Tex. Pen. Code § 6.03(d). To borrow from what we said in Peterson, supra, at 818: "just as a dog
knows the difference between being kicked and being stumbled over, [prosecutors] can distinguish
between intentional or reckless conduct and inadvertent or negligent mistakes." 
45. Slip op. at 50-52.
46. See Oregon v. Kennedy, supra, at 687 n. 22 (Stevens, J. concurring in the judgment)
(complaining that the majority's assumption that trial courts will be deterred from granting
meritorious mistrials is "irrational").
47. Moreover, the argument that the Bauder standard will hurt defendants more than help them
because it will make trial courts reluctant to grant meritorious mistrials was squarely raised in
Presiding Judge McCormack's dissenting opinion. 921 S.W.2d at 704. The Court considered this
argument at the time and rejected it.
48. Slip op. at 51.
49. Id. at 51-52.
50. Slip op. at 52-59.
51. Id. at 56-57. See Ex parte Peterson, supra, at 823-25, 829-30 (Hervey, J., dissenting).
52. One need look no further than Oregon v. Kennedy itself to see that it often takes the Supreme
Court multiple opinions to hone a constitutional standard. In Kennedy the Supreme Court rejected
language from a number of earlier opinions that would have provided federal jeopardy protection
for mistrials caused by prosecutorial "overreaching." 456 U.S. at 677-79. 
53. Slip op. at 59.
54. 203 S.W.3d 317 (Tex. Crim. App. 2006).
55. Id. at 325-26.
56. Slip op. at 63.
57. Lewis v. State, 165 S.W.3d at 381-82.
58. Slip op. at 62-3.